TERMINAL ENTERPRISES, INC., *ETC.*, PLAINTIFF, AND DAVID RODNON AND JOURNAL SQUARE BOARD OF TRADE, A CORPORATION, PLAINTIFFS-APPELLANTS, v. THE CITY OF JERSEY CITY, A MUNICIPAL CORPORATION, DEFENDANT-RESPONDENT.

TERMINAL ENTERPRISES, INC., *ETC.*, PLAINTIFF, AND DAVID RODNON AND JOURNAL SQUARE BOARD OF TRADE, A CORPORATION, PLAINTIFFS-APPELLANTS, v. BOARD OF CHOSEN FREEHOLDERS, COUNTY OF HUDSON, *ETC.*, DEFENDANT-RESPONDENT.

Argued October 6, 1969—Decided November 5, 1969.

Mr. *Bruce Lubitz* argued the cause for plaintiffs-appellants (*Messrs. Hannoch, Weisman, Stern & Besser,* attorneys; *Mr. Bruce Lubitz* on the brief).

Mr. *James F. Ryan* argued the cause for defendant-respondent, The City of Jersey City.

Mr. *Daniel F. Gilmore* argued the cause for defendant-respondent, The Board of Chosen Freeholders, County of Hudson (*Mr. William F. Kelly, Jr.,* attorney).

The opinion of the court was delivered by

PROCTOR, J. This litigation arises out of the adoption of an ordinance and resolution by the City of Jersey City (City) and the Hudson County Board of Chosen Freeholders (County) respectively, whereby the City and the County entered into certain agreements with the Port Authority Trans-Hudson Corporation (PATH) relating to the construction and operation of a proposed Transportation Center in the Journal Square area and to entrance improvements at the Grove-Henderson Street Station. The trial court granted the City's motion to dismiss for failure to state a claim upon which relief could be granted and the County's motion for summary judgment.[1] Plaintiffs filed a consolidated appeal,[2] and we certified the matter before argument in the Appellate Division.

In 1962 the Legislature passed Chapter 8 of the Laws of 1962 authorizing the Port of New York Authority to proceed with a bi-state port development project consisting of the Hudson Tubes, the Hudson Tubes extensions, and the World Trade Center. *L.* 1962, *c.* 8; *N. J. S. A.:* 32 :1–35.50.[3] In this legislation it was recognized that the Hudson & Manhattan Railroad Company, servicing the northern New York-New Jersey metropolitan area, was in an "extreme financial condition" and that its physical plant was "severely deteriorated." *N. J. S. A.* 32 :1–35.50 (3). To upgrade service, the Legislature empowered the Port Authority, either directly

---

[1] In their complaint against the County, the plaintiffs had alleged that the Board of Freeholders acted upon the resolution authorizing its agreement with PATH without examining the exhibits which accompanied the agreement. In support of its motion for summary judgment, the County submitted an uncontradicted affidavit by the Director of the Board which refuted this allegation. The County's motion was then in the same posture as the City's motion to dismiss for failure to state a claim upon which relief could be granted.

[2] Terminal Enterprises, Inc., a plaintiff below, has not pursued this appeal.

[3] New York enacted complementary legislation the same year. Laws of N. Y. 1962, c. 209; McKinney's Unconsol. Laws N. Y., § 6601 *et seq.*

or through its wholly owned subsidiary, PATH, to acquire the railroad. *N. J. S. A.* 32:1–35.50(4), (8); *N. J. S. A.* 32:1–35.52. PATH was also authorized to improve the railroad's terminals in order "to permit transfer of its passengers to and from other transportation facilities." *N. J. S. A.* 32:1–35.50(4). One of its major terminals is situated in the Journal Square area of Jersey City described in the statute as that "bounded generally by Journal square, Hudson boulevard, Pavonia avenue, Summit avenue and Sip avenue, together with such additional contiguous area as may be agreed upon from time to time between the port authority and the said city; * * *." *N. J. S. A.* 32:1–35.51. A report by the Port Authority regarding this terminal was submitted to the Legislature shortly before passage of the Act:

"Preliminary review of the possibilities of developing a new H&M station in Journal Square indicates that a transportation center could be developed at that location, which would include not only a new H&M station but also a bus station, parking garage, and possibly the development of the air rights over the railroad property in the area between Hudson Boulevard and Summit Avenue to the east of Hudson Boulevard.

"* * * It is believed that a multi-purpose transportation center could be developed as a most attractive architectural unit, which would be functionally efficient and which would spark the redevelopment and modernization of the Journal Square area. Such a project could also be coordinated with the City's urban renewal plans.

"Basic to the development in this area, of course, is the location of the H&M trackage and the proposed new Journal Square station. * * * A new H&M concourse could be constructed as part of the complex together with off-street parking facilities for 600 to 700 cars. This concourse would be served directly from Hudson Boulevard as well as adjacent areas in the Square.

"In addition, a new bus station could be constructed to replace an existing bus terminal at Journal Square as well as the many bus loading and unloading platforms at the Journal Square bridge plaza. This new bus station would greatly relieve traffic congestion through the Journal Square area caused by the more than 1,200 buses presently utilizing the streets each day in this area.

"A development of the general type outlined could be the stimulus for a modern, attractive redevelopment of the entire surrounding area in this section of Jersey City. It unquestionably would ensure the

continuance of Journal Square and the surrounding area as Hudson County's major business and commercial center." (Report of the Port Authority on The Hudson & Manhattan World Trade Center Project, January 29, 1962, pp. 12–13.)

On December 5, 1967, the City adopted an ordinance authorizing an agreement with PATH for the rehabilitation of the Hudson Tube facilities. On March 14, 1968, the County adopted a resolution authorizing a similar agreement. Both agreements were approved by the Board of Directors of PATH on July 11, 1968. By the terms of the agreements, PATH would construct and operate a transportation center in the Journal Square Terminal area and would construct station entrance improvements at Grove Street. The total cost of the project was estimated at $45 million.[4]

Regarding the City's obligations the agreement provides:

"In order to secure to the City the benefits of consolidating commuter and other bus loading and unloading within the single location of the Transportation Center:

(a) the City will, concurrently with, or as soon as practicable after its approval of this Agreement, enact a resolution, in the form annexed hereto as Exhibit 'B', to become effective upon the opening to the public of the new facilities of the Transportation Center for the accommodation of omnibuses and their passengers, prohibiting the pickup or discharge by buses of passengers at the bus stops on City streets listed in said resolution. The City agrees that so long as the said facilities for the accommodation of omnibuses and their passengers continue in existence for said purposes, it will not permit the pick-up or discharge by buses of passengers at any point on streets which are now or hereafter may come under the jurisdiction or control of the said City within the area enclosed in red lines on Exhibit 'C' attached hereto ;

(b) The City will, by appropriate amendment to its zoning ordinance and other enactments relating thereto, prohibit the expansion of existing off street bus terminals or the construction of new bus

---

[4] Approximately $17 million of this sum will be provided by the United States Department of Housing and Urban Development (HUD), and the remainder will be funded by PATH. Additionally, the project may be eligible for a grant of $5,683,166 if the Federal government determines that certain planning and mass transportation requirements have been met by the project within three years of the award of the original grant.

terminals at any point in the area of the City within 1,400 feet of the outer limits of the 'Journal Square terminal area' as defined in the aforesaid statutes.

"Upon acquisition by PATH of title to the real property on both sides thereof, the City will, by appropriate legislative action, close Bacot Street in its entirety and that portion of Magnolia Avenue designated by PATH for use in or in connection with the Transportation Center.

"Upon the opening to the public of the new facilities in the Transportation Center for the accommodation of omnibuses and their passengers the City will, when requested so to do, by PATH, by appropriate legislative action, prohibit vehicle parking on those portions of Pavonia, Magnolia, Sip and Summit (between Sip and Pavonia) Avenues designated by PATH as necessary or desirable to permit efficient use of the Center by vehicles making use thereof, and make appropriate provision for a taxicab stand and vehicle loading area at or adjacent to the Magnolia Street entrance to the Center.

\*  \*  \*  \*  \*  \*  \*  \*

"The City will, upon commencement of the construction of the Transportation Center, consult with PATH as to the new or changed traffic signals and signs, street lighting and other similar installations which will be required in City streets in the immediate vicinity of the Transportation Center to properly regulate the changed patterns of traffic and increased vehicular movement and will, at its expense, complete all necessary installations and changes so that the signals, lights, etc. may be made operative upon the opening to the public of the new facilities in the Transportation Center for the accommodation of omnibuses."

The agreement further provides:

"It is understood and agreed that if, notwithstanding occurrence of each of the aforesaid events, PATH's undertaking or completing the construction of the Transportation Center should, in the opinion of PATH, become impracticable in whole or in part, it shall be under no obligation to do so under this Agreement, nor shall it incur hereunder any liability of any kind to the City by reason of its failure to do so."

On December 28, 1967 and March 21, 1968, the plaintiffs filed complaints in lieu of prerogative writs against the City and County respectively. The complaints alleged that the agreements with PATH were invalid for several reasons, three of which have been preserved on appeal; that the defendants have invalidly obligated themselves to legislate and zone in the future concerning public streets, building

codes, and bus and taxi operations; that the defendants have unlawfully delegated power to PATH; that the agreements are invalid on their face since their fulfillment by PATH is optional. The question before us is whether these allegations on the face of the complaints state a claim upon which relief can be granted as a matter of law.

The first allegation — that the defendants have illegally obligated themselves to legislate in the future — is based upon two theories, *i. e.*, that defendants had neither the authority to contract away their police powers nor the power to bind the hands of future city and county officers. Initially, it should be noted that the officers of a municipal corporation may limit by contract their own police powers as well as those of their successors where the agreement is authorized by statute. *Palisades Properties, Inc. v. Brunetti,* 44 *N. J.* 117, 133 (1965); 2 *McQuillin; Municipal Corporations,* § 10.38 (3rd ed. 1949); 10 *McQuillin, supra,* § 29.101. There can be no doubt that PATH has statutory authority to construct and operate a Transportation Center at Journal Square. *N. J. S. A.* 32:1-35.52; *N. J. S. A.* 32:1-35.51. To aid PATH in achieving this objective, we think it clear that the Legislature authorized the City and County to relinquish some of their police powers. *N. J. S. A.* 32:1-35.57 empowers any municipality (defined to include a county, *N. J. S. A.* 32:1-35.51) to enter into agreements with PATH in furtherance of the latter's objectives for the Hudson Tube railroad facilities:

"Notwithstanding any contrary provision of law, general, special or local, * * * any municipality * * * is authorized and empowered to cooperate with the port authority and to enter into an agreement or agreements * * * with the port authority for and in connection with or relating to the acquisition, clearance, replanning, rehabilitation, reconstruction, or redevelopment of * * * any * * * area forming part of the port development project for the purpose of renewal and improvement of said area * * * and for any of the purposes of this act, upon such reasonable terms and conditions as may be determined by such * * * municipality * * * and the port authority. * * *"

Thus, the Legislature has given the City and County broad powers to cooperate with PATH in the construction and operation of the Transportation Center so long as resulting agreements contain "reasonable terms." We think that the terms of the agreements relating to bus operations and public streets are fully within the legislative contemplation. In *N. J. S. A.* 32:1–35.50 the Legislature specifically found that the public interest would be advanced by a central transportation terminal which would provide Hudson Tube passengers with ready access to other forms of transportation. This goal could not be attained unless buses which stopped in the area were instead routed into the terminal. Nor could a central terminal be effectively operated unless bus lines were prevented from building other terminals in or near the area. Moreover, the Legislature was aware that construction of the Center would help to relieve existing traffic congestion "caused by more than 1,200 buses presently utilizing the streets each day in this area." Port Authority Report, *supra*. There is no doubt that the transfer of bus stops to the Center would lessen congestion. The provisions concerning parking and the closing of certain streets serve similar purposes; they are aimed at effecting an efficient operation of the Center and at reducing traffic congestion and were plainly the kinds of terms which the Legislature contemplated. Since these various guarantees which the City and County gave PATH were authorized by the statutes, plaintiffs' reliance on cases which prohibit contract zoning and prevent binding the hands of successors is misplaced.

██ The next allegation is that the defendants have by the agreements illegally delegated their powers to PATH. It must be remembered, however, that PATH is a public agency performing an essential governmental function in the construction and operation of the Center and that the Legislature has found this project to be in the "public interest." *N. J. S. A.* 32:1–35.50(9) ; *N. J. S. A.* 32:1–35.59. The Legislature can reallocate the powers of a municipality

to a public agency. 6 *McQuillin,* § 24.42 *supra.* There is no difference between the Legislature reallocating powers from a municipality to a public agency and authorizing a municipality to partially cede those powers to such an agency. We believe that the Legislature by authorizing municipalities to cooperate with PATH has so acted here.

The complaints next allege that the agreements are unreasonable since they are optional on the part of PATH. Each agreement provides that if in the opinion of PATH the undertaking or construction of the Center should "become impracticable in whole or in part" PATH would be under no obligation to undertake or complete the project. Plaintiffs argue that the obligations concerning street regulations and zoning are obligatory upon the City and County though PATH is permitted unilaterally to abandon its plans for construction of the Center. We disagree. All public agencies are charged with a duty of acting reasonably. See *West Point Island Civic Assn v. Tp. Committee of Dover Tp.,* 54 *N. J.* 339, 346–347 (1969) ; *Grogan v. De Sapio,* 11 *N. J.* 308, 320–322 (1953). There is no reason why PATH should not be charged with such a duty. Should PATH decide to abandon the project, its finding of impracticability within the terms of the agreements would be subject to judicial scrutiny for reasonableness; it could not arbitrarily drop plans for construction or operation of the Center. Thus, the agreements are not wholly optional on the part of PATH. Moreover, the statute, fairly read, does not require that the arrangement between the governmental entities comply strictly with the law of private contracts in providing for consideration. Rather, we think it clear that the Legislature contemplated that these governmental agencies could enter into a relationship which would be practicable and sensible and allow them to cooperate in the construction and operation of this sorely needed Transportation Center.

Finally, plaintiffs contend that the trial judge erred in dismissing their complaints because they were entitled to introduce evidence to show that the obligations of the City

and County under the agreements were not reasonably related to the needs of the Center. This contention is without merit. There is nothing in the language of either complaint or briefs before the trial judge from which he could have found such an allegation.

The judgment of the trial court is affirmed.

*For affirmance*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—NONE.