221 N.J. Super. 558 (1987)
535 A.2d 517
CITY OF NEWARK, A MUNICIPAL CORPORATION OF NEW JERSEY, AND SHARPE JAMES, MAYOR OF THE CITY OF NEWARK AND A TAXPAYER, PLAINTIFFS-APPELLANTS,
v.
ESSEX COUNTY BOARD OF CHOSEN FREEHOLDERS, NICHOLAS AMATO, ESSEX COUNTY EXECUTIVE, THE NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, THE NEW JERSEY BOARD OF PUBLIC UTILITIES, THE NEW JERSEY DEPARTMENT OF COMMUNITY AFFAIRS, HUDSON-ESSEX-PASSAIC SOIL CONSERVATION DISTRICT, AND THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued November 30, 1987.
Decided December 16, 1987.
*560 Before Judges PETRELLA, DREIER and BAIME.
Michael Gordon argued the cause for appellants (Gordon, Gordon & Haley, attorneys; Michael Gordon and Stefanie Brand, on the brief).
H. Curtis Meanor, Acting Essex County Counsel, argued the cause for respondent Nicholas R. Amato, County Executive (Norman Schulaner, Assistant County Counsel, on the brief).
Eileen P. Kelly, Deputy Attorney General, argued the cause for respondents New Jersey Department of Environmental Protection, New Jersey Board of Public Utilities, the New Jersey Department of Community Affairs, and the Hudson-Essex-Passaic Soil Conservation District (W. Cary Edwards, Attorney General of New Jersey, attorney; Michael R. Clancy, Deputy Attorney General, of counsel; Eileen P. Kelly, on the brief).
The opinion of the court was delivered by DREIER, J.A.D.
Plaintiff, the City of Newark (City) has appealed from an approval by the New Jersey Department of Environmental Protection (DEP) of an amended Essex County Solid Waste Management Plan. On July 2, 1987, the City filed an order to show cause and a verified complaint in lieu of prerogative writs in the Law Division challenging the construction and operation of two waste transfer facilities in the City of Newark. The City challenged the adoption by the Essex County Board of Chosen Freeholders (County) of an ordinance which amended the Essex County solid waste management plan to authorize these transfer stations; the City opposed the contracts that the *561 County entered into with two waste management companies for the construction and operation of these transfer stations; and the City contested the certification of the County plan amendment by the DEP.
On July 7, 1987, the parties argued plaintiff's motion before the Law Division. On the same day, the State successfully moved to transfer the case to the Appellate Division on the basis that final State action (DEP certification) was involved.[1] The Law Division judge temporarily restrained all defendants, except the Port Authority of New York and New Jersey (Port Authority) from "permitting the opening and/or operating of" the two planned transfer stations in Newark without further court order. He refused to enjoin the continued construction of the stations.
On July 9, 1987, we heard emergent applications for an accelerated briefing schedule and lifting of temporary restraints. We granted defendants' cross-motion requesting that the temporary restraints be lifted on the basis that "the public good demands utilization of the disputed sites on or before July 31, 1987," and directed an accelerated briefing schedule.
On August 19, 1987, the City moved to amend its complaint, to remand counts one and two of the amended complaint to the Law Division for trial, and to stay the Appellate Division action. On September 10, 1987, we permitted the filing of the amended complaint, but denied the motions for a partial remand and a stay, noting that the factual issues raised in counts one and two of the City's complaint will only be adjudicated if the City prevails on the legal issues presented in this appeal.
Historically, on March 2, 1982 a consent judgment was entered which provided that Essex County could only dispose of its solid waste at the Hackensack Meadowlands landfills until *562 September 2, 1988. An amended consent judgment was entered on May 2, 1983, whereby the County agreed to cease all use of the Meadowlands facility on July 31, 1987 in exchange for financial assistance from the DEP and from the Hackensack Meadowlands Development Commission to construct a resource recovery project for Essex County waste. This long-term solid waste disposal plan was jointly developed by the County and the Port Authority and was expected to be in operation by January 31, 1987. The County decided to locate the facility in Newark, and the County entered a Host Municipality Agreement (Agreement), filed May 31, 1985, with the City of Newark and the Port Authority. In exchange for the property, construction permission and the necessary easements, the City was to receive processing priority at the facility, financial payments for the waste processed at the facility, and financial assistance for industrial development projects. Contained within this comprehensive agreement is the disputed clause, which in pertinent part provides:
5.6 Transfer Stations and Landfills. The County and the Authority hereby covenant and agree that no transfer station or landfill shall be established within the corporate boundaries of the City without the consent of the City....
Unfortunately, the Essex County resource recovery facility construction plans were delayed, and the facility is not scheduled to be operational until 1990. Because the Hackensack landfill was closing on July 31, 1987, the County on December 10, 1986 proposed an interim disposal plan. The County's plan was to solicit companies engaged in solid waste collection, disposal and/or recovery who were interested in the construction and operation of temporary transfer stations, which are facilities where collection trucks are emptied into larger trucks which transfer refuse to out-of-state disposal sites. The County received nine proposals, and on the basis of these proposals the County prepared a proposed amendment to its solid waste management plan. On June 3, 1987, the County held a public hearing on the amendment, and thereafter amended the plan by ordinance to include one transfer station located in Newark *563 which was proposed by Waste Management of New Jersey (WMNJ), another transfer station located in Newark which was proposed by Solid Waste Transfer and Recycling (SWTR), and one in Orange also proposed by SWTR.
On June 8, 1987, DEP certified its approval of this amendment, and on June 18, 1987, adopted a new rule by emergency procedures to streamline the master performance permit process necessary for the immediate development of these transfer station facilities. The rationale was
to avert imminent peril to the public health, safety, welfare and the environment posed by the solid waste disposal crisis facing Essex County....
Governor Kean, on June 23, 1987, certified DEP's findings that an emergency existed sufficient to warrant the emergency rule adoption. On July 31, 1987, the Board of Public Utilities (BPU) accepted the contracts, approved the County's petition for a franchise to cover interim transfer station disposal and the proposed resource recovery facility, and approved a Certificate of Public Convenience and Necessity. The Newark stations have now been operational since August 1, 1987.
The City raises two main points on appeal: First, the City argues that the Host Municipality Agreement was breached because the County amended its solid waste management plan and executed contracts for transfer stations in Newark without the City's approval. Second, the City contends that the transfer station contracts are void because they were awarded in violation of the Local Public Contracts Law which requires public bidding. The City is seeking relief either by an injunction against the operation of the transfer stations or alternatively by a declaration that the host municipality agreement is void and that financing and construction of the resource recovery facility is suspended pending negotiations of another agreement.[2]

*564 I
The first argument presented by the City is that because the Port Authority is jointly financing and constructing the resource recovery facility with the County, the statutes covering the powers and responsibilities of the Port Authority in industrial projects should govern. N.J.S.A. 32:1-35.79 (paragraph 1) authorizes the City to consent to a resource recovery facility, and N.J.S.A. 32:1-35.72p requires municipal consent in certain limited areas:
p. No such port district industrial development projects or facilities are to be constructed unless and until the port authority has entered into an agreement or agreements with the municipality in which any such project or facility is to be located with respect to payments in lieu of real estate taxes and the location, nature and scope of any project or facility....
The consent here was embodied in the host community agreement. The City then contends that the amendment to the County's solid waste management plan locating two interim transfer stations in Newark is invalid because it conflicts with a provision in the host community agreement prohibiting transfer stations to be located in the City.
It is clear that the contractual prohibition in section 5.6 of the Agreement does not relate to payments in lieu of taxes, or the "location, nature and scope" of the resource recovery facility which was the subject of the agreement. The consent embodied in the provision was not therefore a condition precedent to the project. At best it could have been a permissible "reasonable term" authorized by N.J.S.A. 32:1-35.79 (paragraph 1). *565 See also Terminal Enterprises, Inc. v. Jersey City, 54 N.J. 568, 576 (1969).
The County argues that the clause in the host agreement was unreasonable and void because the County may not contract away its legislative or governmental powers. The County argues in the alternative that even if section 5.6 was valid, it is subordinate to the plan amendment which was a necessary and reasonable exercise of police power. The State's argument is that the City is seeking to nullify a State action, certification of the amendment by DEP under N.J.S.A. 13:1E-24, based on a clause in a contract to which the State was not a party. The County and the State jointly assert that their actions were in compliance with the Solid Waste Management Act, N.J.S.A. 13:1E-1 et seq., which regulates solid waste management on a state-wide basis. The City, however, contends that the Port Authority Act includes additional regulations of solid waste disposal when the Port Authority is involved in the project and that these regulations were not complied with.
The City's argument hinges on the "reasonableness" standard enunciated in Terminal Enterprises, supra. Although the Port Authority's involvement in this project should not be ignored, the City's argument misses the critical issue of whether the Solid Waste Management Act, N.J.S.A. 13:1E-5.1 et seq., and the State and County actions that have been taken pursuant to the Act, preempt the clause in question, rendering it unenforceable.
The Solid Waste Management Act requires each county to develop and to implement a comprehensive plan for garbage disposal. N.J.S.A. 13:1E-20. Under the Act, a district (here Essex County) may review its plan, and if found inadequate, a new plan must be adopted pursuant to the appropriate procedures contained in N.J.S.A. 13:1E-23. N.J.S.A. 13:1E-20a(1). The amended plan must then be submitted to DEP for its consideration. The County conducted such a review and adopted an amendment to its pre-existing approved solid waste *566 management plan on June 3, 1987. DEP immediately reviewed the amendment which adds three transfer stations into the approved plan, and DEP approved the amendment pursuant to N.J.S.A. 13:1E-24.
The County argues that section 5.6 is invalid because it limits the County's statutory solid waste planning powers and constitutes an unlawful surrender of that power.
McQuillin, Municipal Corporations, § 10.38 (3d ed. rev. 1979), provides, in part:
Unless authorized by statute or charter, a municipal corporation.... cannot surrender, by contract or otherwise, any of its legislative and governmental functions and powers, including a partial surrender of such powers.
However, if the agreement was specifically authorized by statute, the County could not use the exercise of its police powers as an excuse to escape an obligation which it has incurred. Palisades Properties, Inc. v. Brunetti, 44 N.J. 117, 133 (1965). Thus, to determine whether the clause is invalid, the relevant question is whether the County is authorized by statute to surrender its power to site trash transfer stations. Without State approval, we think not.[3]
N.J.S.A. 32:1-35.79 (paragraph 1) provides that the State, any municipality, commission, public authority or agency
is authorized and empowered ... to enter into an agreement ... with the port authority ... for any of the other purposes of this act ... upon such reasonable terms and conditions as may be determined....
*567 Although this statute authorizes the County and City to enter into an agreement with the Port Authority, the statute does not necessarily authorize section 5.6 of the agreement. See Maese v. Snowden, 148 N.J. Super. 7, 14 (App.Div. 1977). Also, it is arguable that a clause that restricts the County's police power and possibly infringes on the State's right to supervise solid waste management violates the "reasonable term" requirement of the statute.
Furthermore, DEP argues that the Port Authority legislation "evinces an intent to defer to the established solid waste management plans as provisions that would govern such projects." The policy section of the Port Authority legislation states that one of the authorized Port Authority projects is the collection, disposal and utilization of waste, provided that:
the construction and operation of any port district industrial development project and facility ... conform to the environmental and solid waste disposal standards and state and county plans therefor in the state in which such project or facility is located. [N.J.S.A. 32:1-35.72j].
In sum, the Port Authority legislation both omits an explicit authorization to the County to surrender its statutory authority to locate trash transfer stations, and requires conformance to the State's power to control the subject as set forth in the Solid Waste Management Act.
A second answer to the City's argument is that the temporary transfer stations themselves were not encompassed by Section 5.6. The section was written against the background of the closing of the Meadowlands landfill and the expected contemporaneous opening of the resource recovery facility in Newark six months before closure of the landfill. Newark did not want to be burdened by both the recovery project and transfer stations or landfills. The stations here under dispute are not permanent facilities which would coexist with the recovery project; they are temporary stations to be dismantled when the recovery plant becomes operational. Their need was dictated by the frustration of the agreement, not its fulfillment. They thus are a result of emergency actions *568 taken by the County and State outside of the ambit of the agreement.
A third independent basis exists to reject the City's claim. The Waste Management Act and the State's actions pursuant to the Act supersede any contractual provisions entered into between the County, the City, and the Port Authority, even if section 5.6 of the Agreement were authorized and covered these temporary stations. The State contends that the Solid Waste Management Act invalidates section 5.6 as
an unenforceable attempt to amend the Essex County solid waste management plan while avoiding the DEP's review and approval process established by the Solid Waste Management Act and, in particular, mandated by N.J.S.A. 13:1E-24.
The State persuasively argues that the net effect of allowing counties to adopt contracts which govern solid waste planning matters would be to nullify DEP's statutory obligation to coordinate solid waste planning.
Although the Act empowers and requires the counties to develop their own solid waste plans, N.J.S.A. 13:1E-23, the DEP, as the central coordinator, must either approve, reject or modify these plans. N.J.S.A. 13:1E-24b. Section 5.6 of the Agreement prohibits the siting of a transfer station in Newark. This would thus have the effect of modifying the County's solid waste plan; but this revision was never submitted for DEP approval. Therefore, even if the clause were found to encompass these temporary stations, it cannot bind the State. DEP's certification of the County's subsequent amendment siting the three temporary transfer stations in Newark and Orange supersedes any contract between public parties.[4]
The final issue raised under this point is whether, as urged by the City, the siting of the transfer stations in the City renders the entire host municipality agreement void, necessitating *569 that a new agreement be negotiated before the resource recovery facility can proceed. First, it is clear to us that the temporary transfer stations, given the change in circumstances since the signing of the agreement, do not violate its terms. Second, although we have found that section 5.6 has been preempted by the State's action pursuant to the Solid Waste Management Act, section 10.1 of the host agreement provides that in the event that any provision of this agreement is judicially held to be invalid, the rest of the agreement remains in force unless one of the parties is materially prejudiced. Given the temporary nature of the stations and the fact that the City expected to have an even larger resource recovery facility operating at this time, we see no material prejudice from the lesser intrusion of the transfer stations.

II
The City contends in its amended complaint that the contracts for the construction and operation of the transfer stations are null and void because they were awarded in violation of the Local Public Contracts Law, N.J.S.A. 40A:11-1 to 40A:11-49. The City appears to be making two separate, although related, allegations. The first is that the County intentionally created a self-imposed emergency so that it could invoke the emergency public health, safety or welfare provisions of N.J.S.A. 40A:11-6. The second is that even under its own time schedule, the County should not have invoked the emergency provisions, since the County still could have complied with the public bidding requirements.
The County contends that the contracts are not subject to the public bidding statute. The County argues unconvincingly that the policies underlying the requirement of competitive bidding for public contracts do not apply in a situation where the proposals vary depending on site characteristics and other conditions or in a situation where two entities jointly develop a project. N.J.S.A. 40A:11-6.1 does not appear to present a *570 barrier to awarding the contract to the lowest responsible bidder in a situation where the variables are similar but not identical. Furthermore, the public bidding requirements are inapplicable only where "[t]he situation is beyond the reason for the statute and hence is not within it." Whelan v. N.J. Power & Light Co., 45 N.J. 237, 253 (1965). The reasons for the statute are "to guard against favoritism, improvidence, extravagance and corruption, and to secure for the public open and free competition." K.S.B. Tech. Sales v. No. Jersey Water Supply, 150 N.J. Super. 533, 543 (Ch.Div.), aff'd as mod. 151 N.J. Super. 218 (App.Div.), rev'd on other grounds 75 N.J. 272 (1977), app. dism. 435 U.S. 982, 98 S.Ct. 1635, 56 L.Ed.2d 76 (1978). These contracts for garbage transfer stations are not beyond the reasons for the statute.
But the County and the State are correct when they argue that the contracts were properly negotiated under the emergency bidding exception. The Local Public Contracts Law requires that all contracts, except as otherwise provided, that are worth greater than $7,500 be open to public bid and be awarded to the lowest responsible bidder. N.J.S.A. 40A:11-4, -3, -6.1. N.J.S.A. 40A:11-6 provides that:
Any purchase, contract or agreement may be made, negotiated or awarded for a contracting unit without public advertising for bids and bidding ... when an emergency affecting the public health, safety or welfare requires the immediate delivery of the articles or the performance of the service....
The emergency must be declared by the public body which has the authority to enter into the contract. Scatuorchio v. Jersey City Incinerator Authority, 14 N.J. 72, 87 (1953). On July 1, 1987, Essex County entered into agreements with WMNJ and SWTR for the construction of three transfer facilities declaring as its purpose the prevention of a garbage emergency:
[T]he need to have solid waste disposal facilities in place and operational by August 1, 1987 requires that the County act immediately to facilitate by this agreement, the start-up and operation of these transfer stations so as to prevent an emergency solid waste crisis which would substantially affect the public health, safety and welfare.
*571 This emergency situation was explicitly recognized by the DEP in its certification of the County plan amendment, by the DEP and the BPU in their Emergency Redirection of Solid Waste Flow Order, by the BPU in its grant of the certificates of public convenience and necessity, and by the Governor in his certification of DEP's findings that an emergency existed sufficient to warrant the emergency rule adoption.
The City alleges that the County created the emergency by not earlier confronting the problem of lack of garbage facilities. The amended consent judgment was entered in May of 1983 with the knowledge that the Meadowlands landfill would close on July 31, 1987. In May of 1985, the County entered the host municipality agreement with the City and the Port Authority expecting that the resource recovery facility would be operational by January 31, 1987. In December of 1986, the County distributed an interim disposal plan, because the resource recovery facility would not be operational by the time the landfill closed. The City contends that the County and the State "have known for years" that the resource recovery facility would not be operational by the July deadline, and yet they delayed
until the last minute to carry out their responsibilities and then [cried] `emergency' to avoid the requirements of the law.
The City's concern is that public bodies would routinely circumvent the statutory public bidding requirements if they were allowed to award contracts simply by creating their own emergencies.
Although the City's concern is legitimate, the County responds with a valid point:
Public bodies do not lose their powers to respond to emergencies that would affect the public health, safety and welfare because prior governmental inaction may have contributed towards the emergency. The clear purpose of N.J.S.A. 40A:11-6 is to protect the public, not to punish the public because a public official may not have reasonably foreseen a threat to the public health, safety and welfare.
In Scatuorchio v. Jersey City Incinerator Authority, supra, the Court found that the contracts that the City entered into pursuant to the emergency provisions of the Local Public *572 Contracts Law were unenforceable because there was no genuine emergency, and
[o]n its face it appears at best to have been an attempt to avoid the pertinent legislative enactments and public responsibility. [14 N.J. at 88].
In this case, however, the actions of the County, the State, the BPU, the Governor, and common sense, confirm that this is an emergency situation requiring the immediate performance of the services. N.J.S.A. 40A:11-6. Furthermore, the City does not present anything more than a bald accusation that the County delayed this interim proposal so that in bad faith it could circumvent the bidding requirements.
The City's second argument is that even under its own schedule the County could have complied with the bidding requirements, because if the County had started to advertise for bidders on the date it sent out the solicitation, "bidders would have had nearly three months until the February 27 deadline that was set in the solicitation." The City confuses two issues. The solicitation for proposals of transfer sites to be included in the solid waste management plan which began December 10, 1986 was a necessary process before the amendment of the plan could be proposed, or the sites constructed. This solicitation was not one for construction bids. The amendment was not proposed until June 3, 1987, and the State did not certify approval of this amendment until June 8, 1987. The landfill closed on July 31, 1987. The Local Public Contracts Law requires that any advertisement for bids should allow a minimum of ten days from the release of the specifications and bid forms for the preparation and submission of bids, after which a contract may be let. N.J.S.A. 40A:11-23; Waste Disp., Inc. v. Roselle Pk., 145 N.J. Super. 217, 221 (App.Div. 1976). Only after this process could construction be arranged for by the successful bidder. To have complied with these requirements would have precluded the timely construction of these facilities. In the absence of any serious allegation that there was bad faith on the part of the County, the common sense answer is that the County, viewing a mere six weeks to construct *573 the requisite facilities, faced a true "emergency" within the meaning of N.J.S.A. 40A:11-6.
Determining as we do that the contract both was not violated and that the requisite State action superseded its terms, there is no remaining issue to remand to the Law Division. As envisioned in our order of September 10, 1987, the alleged factual issues need not be adjudicated. The complaint is dismissed.
NOTES
[1] Since the relief sought was partially within the jurisdiction of the Law Division and partially within the jurisdiction of the Appellate Division, the transfer was proper. Pascucci v. Vagott, 71 N.J. 40, 52-53 (1976).
[2] We first must address an unrelated issue raised by the Attorney General. The State contends that the City has waived a number of issues which it raised in its complaint and amended complaint but failed to brief. In its reply brief, however, the City strenuously notes that it did not argue those "factual" issues on this appeal to comply with our September 10, 1987 order. We there denied the City's motion for a temporary remand and explained that "[t]he factual issues raised in plaintiff's complaint are subject to future adjudication if it prevails on the legal issues presented in this appeal, but are moot if the field has been preempted, rendering the agreement upon which plaintiff relies incapable of enforcement." The City properly followed the clear implication of this order which is to argue the legal points presented in the current appeal and to reserve the factual issues that require a trier of fact to review the case.
[3] A related question is whether the County could by the Host Municipality Agreement bind successor administrations to its siting of facilities. When a municipality is exercising its governmental powers, as opposed to its business or proprietary powers, no contract that a governing body enters will be binding upon its successors. McQuillan, Municipal Corporations, § 29.101, cited in Terminal Enterprises, supra, 54 N.J. at 575. Therefore the siting of a future transfer station in Newark would still be subject to the County's reasonable exercise of its police powers. It is well established that "[e]very contract is made subject to the condition that its fulfillment may be frustrated by a proper exercise of the police power." So. Hamilton Assoc. v. Mayor & Coun. of Morristown, 99 N.J. 437, 444-445 (1985) (quoting Albigese v. Jersey City, 127 N.J. Super. 101, 113 (Law Div.), judgment mod. 129 N.J. Super. 567 (App.Div. 1974)).
[4] The DEP properly certified the County's amendment to its plan pursuant to N.J.S.A. 13:1E-24, and the DEP also properly adopted the emergency rule to streamline the permit process pursuant to N.J.A.C. 1:30-4.5.