# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

<table>
<tr><td>PUBLIC HOSPITAL DISTRICT NO. 1<br>OF KING COUNTY,<br><br>    Appellant,<br><br>v.<br><br>UNIVERSITY OF WASHINGTON and<br>U.W. MEDICINE,<br><br>    Respondents.</td><td>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)</td><td>No. 70633-1-I<br><br>DIVISION ONE<br><br><br><br>PUBLISHED<br><br>FILED: <u>June 23, 2014</u></td></tr>
</table>

Cox, J. — Public Hospital District No. 1 of King County seeks to invalidate as ultra vires the Strategic Alliance Agreement between it and the University of Washington. Because there are no genuine issues of material fact and the university is entitled to judgment as a matter of law, we affirm the summary dismissal of this action.

The district is a public agency, as defined by RCW 39.34.020. It both owns and operates Valley Medical Center in Renton, Washington.

The university is also a public agency under RCW 39.34.020. For purposes of this matter, the university operates through U.W. Medicine, one of its component organizations.

The district, through its commissioners, and the university entered into the Strategic Alliance Agreement dated June 30, 2011. The initial term of the agreement runs through December 31, 2026, subject to the occurrence of certain early termination conditions. The initial term of the agreement may be extended for each of two 15-year additional periods.

The stated purpose of the agreement is to establish "joint or cooperative action pursuant to RCW 39.34.030," the statute that provides for agreements for joint or cooperative action by public agencies.[1] Among other things, the agreement establishes the governance structure for overseeing the operation of the district's health care system as an integral component of U.W. Medicine. The agreement also sets forth, in detail, a number of terms and conditions, some of which we discuss more fully later in this decision.

After the district and university executed this agreement and following the 2011 election of new commissioners of the district, three of the five commissioners of the new board approved a resolution that authorized the president of the board of commissioners to "initiate litigation, if necessary, to determine the validity of the Strategic Alliance Agreement with the University of Washington."[2] This litigation followed.

The district and the university both moved for summary judgment. The trial court granted the university's motion and denied the district's motion. It dismissed the district's action with prejudice.

---

[1] Clerk's Papers at 416.

[2] Id. at 512-14.

The district appeals.

## VALIDITY OF STRATEGIC ALLIANCE AGREEMENT

The district contends that the agreement is ultra vires. Specifically, it contends that the former district commissioners "effectively divested the Board of Commissioners of core responsibilities as elected officials."[3] The district identifies these responsibilities as "crucial fiscal decisions, like establishing the District budget, levying taxes, and incurring debt, and selecting the District's chief executive officer."[4] We hold that this agreement is not ultra vires.

Summary judgment is appropriate when there is no genuine issue of material fact, and the moving party is entitled to a judgment as a matter of law.[5] We review de novo summary judgment orders.[6]

Generally, "independent of statute or charter provisions, the hands of [successor officers of a municipal entity] cannot be tied by contracts relating to governmental matters."[7] But predecessor officers "may limit by contract their

---

[3] Brief of Appellant at 19.

[4] Id.

[5] CR 56(c).

[6] Cornish Coll. of the Arts v. 1000 Va. Ltd. P'ship, 158 Wn. App. 203, 215-16, 242 P.3d 1 (2010).

[7] 10A EUGENE MCQUILLIN, MUNICIPAL CORPORATIONS § 29.102 at 70 (3d ed. rev. 2009).

own police powers as well as those of their successors where the agreement is authorized by statute."[8]

Statutory construction is a question of law.[9] This court's objective is to determine the legislature's intent.[10] "Where the language of a statute is clear, legislative intent is derived from the language of the statute alone."[11]

Here, no one argues that any genuine issue of material fact exists. The arguments of the parties are primarily focused on the provisions of the agreement that they signed in 2011. Thus, the issue is whether the university is entitled to judgment as a matter of law based on the provisions of the agreement and controlling law.

The fundamental legal question for this issue is whether relevant legislation authorizes this agreement. If so, a mere change in the view of the

---

[8] Id. at 70-71 n.4 (citing Terminal Enters., Inc. v. Jersey City, 54 N.J. 568, 258 A.2d 361 (1969)); see also City of Seattle v. Auto Sheet Metal Workers Local 387, 27 Wn. App. 669, 685, 620 P.2d 119 (1980), overruled on other grounds by City of Pasco v. Pub. Emp't Relations Comm'n, 119 Wn.2d 504, 511-12, 833 P.2d 381 (1992) (citing Lutz v. City of Longview, 83 Wn.2d 566, 570, 520 P.2d 1374 (1974); Noe v. Edmonds Sch. Dist. 15, 83 Wn.2d 97, 515 P.2d 977 (1973); In re Puget Sound Pilots Ass'n, 63 Wn.2d 142, 145-46 n.3, 385 P.2d 711 (1963); Roehl v. Public Util. Dist. No. 1 of Chelan County, 43 Wn.2d 214, 240, 261 P.2d 92 (1953); Neils v. City of Seattle, 185 Wash. 269, 53 P.2d 848 (1936); Benton v. Seattle Elec. Co., 50 Wash. 156, 96 P. 1033 (1908)) ("The rule in this state and others is that where the legislature by enabling legislation indicates the legislative body authorized to perform a legislative function, that body may not delegate its power absent specific legislative authorization.").

[9] City of Spokane v. Rothwell, 166 Wn.2d 872, 876, 215 P.3d 162 (2009).

[10] Id.

[11] Id.

majority of the commissioners as to the validity of the agreement does not render the agreement ultra vires.

We conclude that the agreement was authorized by the statutes governing public hospital districts and the Interlocal Corporation Act.[12]

The legislature first enacted the statutes governing public hospital districts in 1945.[13] It authorized local communities to establish municipal corporations, known as "public hospital districts."[14] These districts are established "to own and operate hospitals and other health care facilities and to provide hospital services and other health care services for the residents of such districts and other persons."[15]

Chapter 70.44 RCW sets forth the powers of public hospital districts. Among others, these powers include: (1) the power to "contract indebtedness";[16] (2) the power to "raise revenue by the levy of an annual tax on all taxable property";[17] (3) the power to "adopt the budget";[18] and (4) the power to appoint and compensate the chief administrative officer for the district.[19]

---

[12] See Clerk's Papers at 414-15.

[13] RCW 70.44.010.

[14] Id.

[15] RCW 70.44.003.

[16] RCW 70.44.060(5).

[17] RCW 70.44.060(6).

[18] Id.

[19] RCW 70.44.070, .080.

5

Importantly, RCW 70.44.060(7) provides the district with the power "[t]o enter into any contract with the United States government or any state, municipality, or other hospital district, or any department of those governing bodies, *for carrying out any of the powers authorized by this chapter.*"[20] The plain language of this provision authorizes the district to contract with the university, a state entity, to carry out any of the district's powers.

Additionally, RCW 70.44.240 specifically authorizes public hospital districts to contract with or join with certain other entities to provide health care services:

> Any public hospital district may contract or join with any other public hospital district, publicly owned hospital, nonprofit hospital, legal entity, or individual to acquire, own, operate, manage, or provide any hospital or other health care facilities or hospital services or other health care services to be used by individuals, districts, hospitals, or others, including providing health maintenance services.

The agreement that is before us establishes a means for joint or cooperative action between the district and the university for the operation of the district's health care system. Reading together RCW 70.44.060(7) and RCW 70.44.240, the legislature expressly authorized this type of agreement. Thus, the agreement falls within the express scope of authority specified in these statutes.

The Interlocal Corporation Act, enacted in 1967, provides further support that the Strategic Alliance Agreement is expressly authorized.[21] The purpose of this act is:

---

[20] (Emphasis added.)

[21] Chapter 39.34 RCW.

6

> to permit local governmental units to make the most efficient use of their powers by enabling them to cooperate with other localities on a basis of mutual advantage and thereby to provide services and facilities in a manner and pursuant to forms of governmental organization that will accord best with geographic, economic, population and other factors influencing the needs and development of local communities.[22]

Specifically, RCW 39.34.030 authorizes public agencies to enter into agreements to act jointly and cooperatively. This provision explains that "[a]ny power or powers, privileges or authority exercised or capable of exercise by a public agency of this state may be exercised and enjoyed jointly with any other public agency of this state having the power or powers . . . ."[23] Thus, this act provides additional support that the agreement is expressly authorized.

The district argues that the Strategic Alliance Agreement is ultra vires because it delegates to others the district's core legislative powers: the power to establish a budget, the power to levy taxes, the power to issue public debt, and the power to appoint and compensate the district's chief administrative officer. We conclude that this statutorily authorized agreement is not an unlawful delegation of the district's powers.

A New Jersey case is illustrative of the principles at issue when public agencies enter into statutorily authorized agreements.[24] In Terminal Enterprises,

---

[22] RCW 39.34.010.

[23] RCW 39.34.030(1).

[24] Terminal Enters., Inc., 54 N.J. at 575.

7

Inc. v. Jersey City, the supreme court considered a claim that the agreements between public agencies was an unlawful delegation of power.[25]

There, the city of Jersey City (city) and Hudson County Board of Chosen Freeholders (county) entered into agreements with the Port Authority Trans-Hudson Corporation (PATH) regarding the construction and operation of a transportation center in the Journal Square area.[26] Plaintiffs, David Rodnon and Journal Square Board of Trade, filed a complaint against the city and county alleging, among other claims, that the city and county had "unlawfully delegated power to PATH" by entering into these agreements.[27]

The court rejected this claim because it concluded that the legislature had authorized the "municipalities to cooperate with PATH" and enter into such agreements.[28] It explained:

> The . . . allegation is that the [city and county] have by the agreements illegally delegated their powers to PATH. It must be remembered however, that PATH is a public agency performing an essential governmental function in the construction and operation of the Center and that the Legislature has found this project to be in the "public interest." The Legislature can reallocate the powers of a municipality to a public agency. There is no difference between the Legislature reallocating powers from a municipality to a public agency and authorizing a municipality to partially cede those powers to such an agency.[29]

---

[25] Id. at 576-77.

[26] Id. at 571.

[27] Id. at 574-75.

[28] Id. at 576-77.

[29] Id. (citations omitted).

8

Here, like <u>Terminal Enterprises</u>, the legislature has statutorily authorized the district and the university, two public agencies, to enter into the Strategic Alliance Agreement. While this agreement provides for the district to partially delegate some of its powers to the university, as the <u>Terminal Enterprises</u> court stated, "There is no difference between the Legislature reallocating powers from a municipality to a public agency and authorizing a municipality to partially cede those powers to such an agency."[30] Thus, <u>Terminal Enterprises</u> supports our conclusion that this statutorily authorized agreement is not an unlawful delegation of the district's powers.

Additionally, despite the district's arguments to the contrary, we note that the express terms of the Strategic Alliance Agreement provide that the district retains powers that it now argues have been delegated. Article VII, Reserved Powers, sets forth the "District-Reserved Powers," which include the following:

> (a) Notwithstanding anything in this Agreement to the contrary, none of the following actions may be taken by or on behalf of the District Healthcare System by either the Board or the UW Medicine CEO, **unless first approved by the District's Board of Commissioners**:
>
> . . .
>
> (iii) the exercise of **the District's statutory power to raise revenues by the levy of Regular Property Taxes** on taxable property within the District's boundaries; provided, however, the District is subject to the requirements of Section 9.1;
>
> . . .
>
> (vii) **the incurrence of Indebtedness** except as otherwise permitted by Section 4.18(a) and as long as such Indebtedness does not exceed the amounts permitted under Section 7.1(a)(ii);

---

[30] <u>Id.</u> at 577.

(viii) *the issuance of Bonds by the District*, which actions may be taken only be resolutions duly adopted by the District's Board of Commissioners; provided, however, the District has committed itself to incure Indebtedness and issue, or cause to be issued, Bonds as and to the extent required to fund the expenses referenced in Section 4.18(c); . . . .[31]

Moreover, Exhibit 3.10(c) of the agreement provides a detailed chart titled "Allocation of Statutory Obligations of District."[32] The chart identifies specific actions that may be taken, identifies relevant statutes, and specifies whether the power to take such actions is retained by the district, delegated to the Board of the District Healthcare System, or jointly shared. Items numbered 22, 23, 25, 27, 28, and 30 on this chart show that the powers relevant to this challenge are retained by the district, not delegated.[33] In short, the argument that there was an abdication of governmental powers by the previous majority of commissioners by entering into this agreement is not supported by a fair reading of this agreement.

The district also asserts that the Strategic Alliance Agreement is ultra vires because the agreement purports to bind successor commissioners in the performance of governing functions. It cites McQuillin and two attorney general opinions to support this assertion.

First, the district cites Eugene McQuillin's treatise in support of this argument. Specifically, the district states in its opening brief:

"Respecting the binding effect of contracts extending beyond the terms of officers acting for the municipality, there exists a clear

---

[31] Clerk's Papers at 444-45 (emphasis added).

[32] Id. at 470-76.

[33] Id. at 472-73.

10

distinction in the judicial decisions between the governmental and business or proprietary powers. With respect to the former, their exercise is so limited that no action taken by the governmental body is binding upon its successors, whereas the latter is not subject to such limitations, and may be exercised in a way that will be binding upon the municipality after the board exercising the power shall have ceased to exist."[34]

While that is the general rule on the binding effect of contracts that extend beyond the terms of officers acting for a municipality, that rule is inapplicable here. That is because this case falls into the well-recognized exception that such contracts are binding where legislation authorizes them.[35] As we discussed previously in this opinion, the Strategic Alliance Agreement is expressly authorized by RCW 70.44.060(7), RCW 70.44.240, and the Interlocal Corporation Act.

Second, the district cites a 2012 attorney general opinion, which is persuasive but not binding authority, to support this argument.[36] In Attorney General Opinion No. 4, the attorney general explains that Washington law "establishes that boards of county commissioners may not take actions that impair the core legislative powers of their successors in office."[37] The attorney

---

[34] Brief of Appellant at 19-20 (quoting MCQUILLIN, supra, § 29.102 at 67-68).

[35] See MCQUILLIN, supra, § 29.102 at 70-71.

[36] Brief of Appellant at 24; Reply Brief of Appellant at 11-12 (citing 2012 Op. Att'y Gen. No. 4); see Thurston County ex rel. Bd. of County Comm'rs v. City of Olympia, 151 Wn.2d 171, 177, 86 P.3d 151 (2004) ("Although not controlling, attorney general opinions are entitled to great weight.").

[37] 2012 Op. Att'y Gen. No. 4 at 1.

general cites State ex rel. Schlarb v. Smith for this principle.[38]

In Schlarb, King County and Pierce County entered into an agreement to improve, confine, and protect the White River.[39] The counties agreed to pay a certain percentage for the project, but King County declined to levy a tax pursuant to the agreement.[40] King County argued that the agreement was against public policy because "one board of county commissioners cannot enter into contracts binding upon future boards of commissioners."[41] But the supreme court explained that the principle did not apply "to a contract entered into under specific statutory authority."[42]

Here, a similar conclusion is appropriate. The principle on which the district relies does not apply because, as previously discussed, the Strategic Alliance Agreement was entered into under specific statutory authority.[43] Consequently, the attorney general opinion and Schlarb do not support the district's argument.

Third, by statement of additional authorities, the district points to another attorney general opinion for the assertion that the "Attorney General also

---

[38] Id. at 2-3 (citing State ex rel. Schlarb v. Smith, 19 Wn.2d 109, 141 P.2d 651 (1943)).

[39] Schlarb, 19 Wn.2d at 111.

[40] Id. at 111-12.

[41] Id. at 112.

[42] Id. at 112-13.

[43] See RCW 70.44.060(7); RCW 70.44.240; RCW 39.34.030.

acknowledges that public hospital districts may not avoid statutory requirements by delegating management responsibilities to an administrator under RCW 70.44.060 because the elected commissioners of a district remain 'legally responsible for operations and policy.'"[44] Here, the district did not try to avoid statutory requirements by entering into the Strategic Alliance Agreement. Rather, as previously discussed, the district was acting within its statutory authority when it contracted with the university. Thus, this additional authority is also not helpful.

The district next contends that RCW 70.44.240 prohibits the district from "relinquish[ing] the core responsibilities of its elected commissioners to unelected trustees."[45] But the plain language of RCW 70.44.240 does not support the district's argument. Rather, this provision explains who must be a part of the governing body when a public hospital districts chooses to contract or join with another entity:

> The governing body of such legal entity *shall* include representatives of the public hospital district, which representatives *may* include members of the public hospital district's board of commissioners.[46]

This provision requires representatives from the district, but the representatives do not have to include the district's commissioners. Thus, RCW 70.44.240 contemplates a situation where the governing body does not include the elected

---

[44] Statement of Additional Authorities at 1 (quoting 2013 Op. Att'y Gen. No. 3 at 8).

[45] Brief of Appellant at 28-35.

[46] RCW 70.44.240 (emphasis added).

13

commissioners. In any event, the board of trustees created by the Strategic Alliance Agreement includes the five commissioners *and* five individuals residing within the district's service area. Thus, there is no violation here of this statutory provision.

The district also relies on Chemical Bank v. Washington Public Power Supply System to support its position.[47] It argues that this case supports the principle that municipalities cannot "abdicate[] their statutory responsibilities."[48] While that principle of law is correct, that case does not control here.

In Chemical Bank, a large number of "participants," including cities, public utility districts, and other districts, entered into agreements regarding the construction of two nuclear generating plants.[49] Statutes authorized cities and public utility districts to build or buy their own plants.[50] But to have authority for these types of joint projects, cities and districts needed an ownership interest or control in the projects.[51]

The supreme court looked to the participants' agreements to determine their level of management and control in the projects.[52] The agreement created

---

[47] Brief of Appellant at 22-24 (citing Chem. Bank v. Wash. Pub. Power Supply Sys., 99 Wn.2d 772, 666 P.2d 329 (1983), aff'd, 102 Wn.2d 874 (1984)).

[48] Id. at 23.

[49] Chemical Bank, 99 Wn.2d at 777.

[50] Id. at 784-85.

[51] Id. at 785, 787.

[52] Id. at 787.

a "part-time committee of representative participants," but the court concluded that these representatives could not provide "significant input to the management of the projects" given rigid procedural requirements.[53]

The court recognized the "necessity and propriety of establishing representative committees to manage and oversee joint development projects."[54] But the court was concerned that the committee "served as a rubber stamp" for project decisions, and the participants did not actually have management or control in the projects.[55] The court went on to conclude that the participants' agreements were ultra vires based on this concern and a number of other concerns.[56]

Here, there is a similar project as the one in Chemical Bank, where the supreme court expressly acknowledged the "necessity and propriety of establishing representative committees to manage and oversee joint development projects."[57] The Strategic Alliance Agreement that the district attacks provides for a management structure composed of representatives of the district and the university.

But Chemical Bank is distinguishable because the new board of trustees is not a "rubber stamp." The five elected commissioners of the district are part of

---

[53] Id.

[54] Id.

[55] Id. at 788.

[56] Id. at 798.

[57] Id. at 787.

the board of trustees. In that capacity, they help to manage and oversee the delivery of health care services to the public. Nothing in this record substantiates the claim that they rubber stamp anything. Even though the commissioners do not represent a majority of the board, they are able to provide "significant input."[58] For these reasons, this case is distinguishable from Chemical Bank.

The district next argues that the delegation of legislative powers under the Strategic Alliance Agreement is "anti-democratic and impermissible under our constitutional system."[59] It contends that the university's "argument, far from honoring democratic principles, represents a dangerous invitation to elected officials to abdicate their responsibility for the operation of a local government to an unelected group of 'trustees' who are not accountable to the voters served by the local government."[60]

The simple answer to this argument is that the elected representatives of the people—the legislature—expressly authorized the type of agreement in this case. This is consistent with both representative democracy and our constitution. The remedy for disagreement with these statutes is to seek redress from the legislature, not the courts.

Finally, the district, in its reply brief, asserts that to the extent the statutes condone the "cession of the elected Commissioners' core legislative

---

[58] Id.

[59] Reply Brief of Appellant at 24.

[60] Id.

16

responsibilities to the unaccountable trustees," the statutes are unconstitutional.[61] It cites article I, section 9 of the state constitution.[62] But the district provides no further argument.[63] "'[N]aked castings into the constitutional seas are not sufficient to command judicial consideration and discussion.'"[64] Because statutes are presumed to be constitutional and the district's constitutional claim is not supported by sufficient argument, the district has failed to meet its burden to overturn the statutes.[65] Accordingly, we do not address this claim further.[66]

In sum, all that has changed since the signing of the Strategic Alliance Agreement is the view of the majority of the members of the board of commissioners about its validity. Under the circumstances of this case, that does not constitute a basis for declaring the agreement ultra vires. The trial court properly granted the university's motion for summary judgment dismissing the district's claims with prejudice.

---

[61] Id. at 17.

[62] Id. (citing CONST. art. I, § 19) ("All elections shall be free and equal, and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage.").

[63] See id. at 17-18.

[64] State v. Johnson, 179 Wn.2d 534, 558, 315 P.3d 1090 (2014) (alteration in original) (internal quotation marks omitted) (quoting State v. Blilie, 132 Wn.2d 484, 493 n.2, 939 P.2d 691 (1997)).

[65] See Haley v. Med. Disciplinary Bd., 117 Wn.2d 720, 739, 818 P.2d 1062 (1991) ("A statute is presumed to be constitutional.").

[66] See State v. Johnson, 119 Wn.2d 167, 171, 829 P.2d 1082 (1992); Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

## MOTION TO EXPAND APPELLATE RECORD

The district moves, pursuant to RAP 9.11(a), to expand the appellate record to consider an e-mail from Valley Medical Center's general counsel to the secretary of the district commissioners.[67] We deny this motion.

First, this e-mail was sent after the trial court granted the university's motion for summary judgment. Thus, it was not before the court when it granted summary judgment. For this reason alone, we could deny the motion.

Second, even if we reach the substance of the motion, it has no merit. RAP 9.11(a) provides that an "appellate court may direct that additional evidence on the merits of the case be taken before the decision of a case on review" if the following six requirements are all met:

> (1) additional proof of facts is needed to fairly resolve the issues on review, (2) the additional evidence would probably change the decision being reviewed, (3) it is equitable to excuse a party's failure to present the evidence to the trial court, (4) the remedy available to a party through postjudgment motions in the trial court is inadequate or unnecessarily expensive, (5) the appellate court remedy of granting a new trial is inadequate or unnecessarily expensive, and (6) it would be inequitable to decide the case solely on the evidence already taken in the trial court.

Here, the e-mail from Valley Medical Center's general counsel raises concerns about several agenda items for a particular board of commissioners meeting. The e-mail explains general counsel's view of how the commissioners' powers and activities have allegedly changed since the Strategic Alliance Agreement with respect to the hiring of bond counsel and community outreach

---

[67] District's Motion to Expand Appellate Record Pursuant to RAP 9.11 at 1-2.

expenditures. The district argues that this e-mail "represent[s] the position of the trustees [and] demonstrates unequivocally the severity of the curtailment of the fiscal authority of the elected [c]ommissioners."[68]

This e-mail is not "needed to fairly resolve the issues on review" and it does not "probably change the decision being reviewed."[69] Because these requirements of RAP 9.11(a) are not met and this e-mail was not before the trial court when it rendered its decision on summary judgment, we deny the motion.

We affirm the summary judgment order of dismissal.

Cox, J.

WE CONCUR:

_____

Leach, J.

_____

Dwyer, J.

---

[68] Id. at 2.

[69] See RAP 9.11(a)(1), (2).