IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| SARAH'S CARE ADULT FAMILY HOME (SARAH EVERT AND STEPHEN EVERT), | ) ) ) | No. 32881-3-III |
| | ) | |
| Appellants, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| DEPARTMENT OF SOCIAL AND HEALTH SERVICES, Adult Protective Services, | ) ) ) | |
| | ) | |
| Respondent. | ) | |

FEARING, J. — The Department of Social and Health Services (DSHS) revoked the

adult family home license of Stephen and Sarah Evert, d/b/a Sarah's Care Adult Family

Home (Sarah's Care) because of abuse and neglect of residents by Sarah. DSHS also

fined the Everts $441,000 for posting, on a website, adult family home residents'

personal medical information and treatment plans. The superior court affirmed the

revocation of the license, but reduced the fine to $21,000. On appeal to the Court of

Appeals, the Everts challenge the sufficiency of the evidence that Sarah Evert abused and neglected former residents, contend that the First Amendment protects their posting of residents' personal medical information, and argue the $21,000 fine against them violates the Eighth Amendment's prohibition on excessive fines. We affirm the superior court.

## FACTS

In February 2012, DSHS licensed Sarah's Care as an adult family home in Spokane. Sarah and Stephen Evert owned and operated the home.

Events relevant to this appeal began in August 2012, when Loganhurst, a Spokane adult care facility, abruptly closed. DSHS, needing to find immediate placement for Loganhurst residents, contacted Sarah's Care and asked it to accept some residents. Sarah's Care accepted two Loganhurst residents, Debbie and Greg, whose care gave rise to the DSHS charges of abuse and neglect. Sarah Evert did not want either denizen as a long-term resident because the respective state reimbursement rates for Debbie's and Greg's care was lower than the rate for other residents.

On August 19, 2012, Debbie moved into Sarah's Care. Sarah Evert then received a full medical assessment for Debbie and learned that Debbie needed extensive care. Debbie's assessment stated that she manipulated staff, especially as to her medications. Debbie has a history of overdosing. She once attempted suicide. Debbie suffers from the results of a stroke, blindness, fibromyalgia, chronic pain, memory deficits, and mental health issues. Debbie required medication and bathing assistance. Sarah wanted to

2

revoke acceptance of Debbie, but believed she could not refuse care.

In part because of the history of manipulative behavior by Debbie, Sarah Evert disbelieved that Debbie was blind, told her she was not blind, and called her a "prescription drug addict." Report of Proceedings (RP) (Apr. 15, 2013) at 61. Sarah, defying the instructions in Debbie's care plan, directed Sarah's Care staff to withhold shower and phoning assistance to Debbie. Stephen and Sarah Evert placed Debbie's thirty-five medications in a black toolbox with cards describing her complex medication regime. Sarah convinced Debbie's doctor to write a note stating Debbie could manage all medications, except narcotics, herself. Therefore, Sarah instructed Sarah's Care staff to dispense only narcotics to Debbie.

Renee, a caregiver at Sarah's Care, witnessed a troubling example of Sarah and Stephen Everts' treatment of Debbie. While taking pills during breakfast, Debbie dropped a pill on the floor. Renee looked for the pill, but Sarah intervened and scolded Debbie by commenting: "What would happen if another resident or one of the dogs got the pill?" RP (Apr. 15, 2013) at 57. Debbie employed a chair to lower herself to look for the pill on her hands and knees. When she found it, Sarah exclaimed: "See, I knew you could see, or words to that effect." Clerk's Papers (CP) at 23. Debbie tearfully fled to her room without breakfast. Sarah then directed staff members not to help Debbie retrieve pills because Debbie manipulated staff by dropping the medications excessively. Sarah also articulated to Sarah's Care staff a hope that Debbie would overdose on her

3

medications or "blow up," so the adult family home could transport Debbie to a hospital emergency room and leave her there.

On September 4, 2012, Stephen Evert, in front of a caregiver and other residents, approached Debbie during lunch and demanded payment for her care. Debbie explained to Stephen that the State paid for her care. Stephen raised his voice. Stephen threatened to send Debbie away in a taxi if she did not pay. To satisfy Stephen, Debbie unsuccessfully tried to contact her DSHS caseworker. At the license revocation hearing, Stephen testified that his comment to Debbie was not a threat but an offer to summon a taxi to take her to an ATM machine to withdraw money to pay the Everts in advance for the month of September. Generally, when a resident refuses to pay for her care, an adult family home may issue a thirty-day notice to vacate. The Everts issued no notice to Debbie because of their erroneous belief that an adult family home needed to provide notice only if the resident resided in the home for at least thirty days. The regulation, however, requires that the adult family home provide a resident of less than thirty days a notice to vacate "as soon as practicable before transfer or discharge." WAC 388-76-10615(4).

On September 4, 2012, when Sarah Evert returned home from another job, she learned of the confrontation between Stephen and Debbie. An angry Debbie said to Sarah: "I'll show you." RP (Apr. 16, 2013) at 229. In response, Sarah directed Debbie into a car. Debbie complied, and Sarah took Debbie and her medications to the Sacred

4

Heart Hospital emergency room. Debbie did not know her destination until inside the car. Sarah registered Debbie at the emergency room and told hospital staff that Debbie overdosed on medication. Sarah added: "I can't stay," and she left the emergency room before any staff member could interview her. RP (Apr. 16, 2013) at 144.

The Sacred Heart emergency room diagnosed Debbie with stress and abandonment by an adult family home. Hospital staff contacted Spokane police, who investigated the incident. A responding officer wrote that Sarah's Care "summarily dumped [Debbie at Sacred Heart], as if she were excessive baggage." Administrative Record (AR) at 111. The officer added in his report:

> Apparently the owners/operators, of the privately operated but state funded group home, Sarah and Stephen Evert had decided that [Debbie] required more effort and work than they cared to provide for and had decided that dropping her off at the Sacred Heart emergency room was a way to dispose of their requirement, to be responsible for her health and welfare.

AR at 111.

Spokane police traveled to Sarah's Care to speak with Stephen and Sarah Evert. Sarah told the police she conveyed Debbie to the hospital because Debbie overdosed. When police questioned the propriety of Sarah's actions, she diplomatically responded, "What are you going to do? Send a [d]eputy out here to beat me up?" AR at 111. Sarah then telephoned the Sacred Heart emergency room and left a message with the hospital secretary stating: "she dropped the resident off because the resident had aggressive,

5

disruptive behavior." RP (Apr. 15, 2013) at 71. Later, when DSHS investigated Sarah's Care, Sarah told an investigator that she took Debbie to the emergency room because Debbie caused excessive stress to other residents.

Sarah's Care also took custody of another Loganhurst resident, Greg, whom Stephen and Sarah Evert also believed would be a short-term resident. Greg moved into Sarah's Care Adult Family Home on August 21, 2012. Before accepting Greg, the Everts received his full assessment, care plan, and medical chart. The Everts negotiated a new care plan with Greg. Greg suffers from a traumatic brain injury and is wheelchair bound. The brain injury causes cognitive impairments and renders Greg prone to agitation, yelling, screaming, and crying. Greg's indistinct speech adds to his agitation. Greg also unacceptably touches female caregivers. Greg required more of staff's time, attention, and assistance than other residents of Sarah's Care.

DSHS assessment records recommended altering Greg's unsuitable behaviors by taking him outdoors until he quietens, petting and holding his cat, and calling a friend or family member. DSHS advocated that a female caregiver immediately confront Greg if he offensively touched her. Two Sarah's Care staff members expressed fear and intimidation when Greg attempted sexual fondling.

Greg's chart notes at Sarah's Care showed no behavioral incidents until September 3, 2012. That day Greg grew agitated and raised his fist to a staff member as if ready to hit her. Staff called 911, and the responding police officers declined action. Sarah's Care

staff also called mental health professionals, who arrived to evaluate Greg. Sarah Evert requested the professionals perform a mental health assessment on Greg to determine whether he should be civilly committed. Greg asked to speak to his attorney, but allowed the assessment to proceed. The evaluators concluded Greg did not qualify for involuntary commitment because Greg was not a danger to himself or others. The professionals noted that Greg was unhappy with his current placement and wished to smoke marijuana for pain management and appetite stimulation. Greg possessed a medical marijuana card and smoked at his former adult family home. He was also upset at the loss of his cat, who he described as his "best friend." AR at 447.

After the visit by mental health professionals on September 3, Stephen and Sarah Evert handed Greg a discharge notice, which DSHS later determined breached the requirements of WAC 388-76-10615. The notice omitted a location to where Greg would be discharged and the contact information of the state long-term care ombudsman. *See* WAC 388-76-10615. The discharge letter declared:

> You have exhibited unacceptable behavior that has endangered the well being [sic] of, and caused a great deal of stress to other residents and staff and have exhibited violent tendencies threatening with your fists and yelling and swearing at the caregiver.
> This behavior will not be tolerated here. It puts everyone at risk of injury and causes an unnecessarily unpleasant environment. I expect you to be civil for the remainder of your stay here. If you choose to leave earlier than 30 days, that will be acceptable to me. If you choose to act violently or swear and scream abusively at the staff or residents I will file criminal charges against you. Also, you will not be allowed to smoke pot or use illicit drugs of any kind, or invite your drug providers to the premises. The

police will be called immediately under these circumstances.
Your 30th day will be October 2, 2012. I will assist you in any way I can to facilitate a smooth transition.

AR at 445. Greg's chart notes did not contain any incidents of smoking pot or inviting drug dealers to Sarah's Care, nor were there any other incidents of aggression besides the incident that occurred that day.

Upon handing Greg the discharge notice, Stephen Evert told Greg: "I am tired of putting up with your crap; if I have to, I'll tie a rope to your chair and pull you out with my tractor." CP at 20-21. Stephen also declared: "if the police and the fire department don't take you, I'll put you out into the yard." CP at 21. When later asked by a DSHS investigator if the Everts attempted any reasonable accommodation to remedy Greg's unacceptable behavior, Stephen responded: "[we] did everything to accommodate him except for hav[ing] drug dealers." CP at 22. Stephen could not identify any examples of reasonable accommodation.

DSHS received complaints against Sarah's Care that alleged failure to conduct an appropriate tuberculosis screening of a caregiver and inappropriate treatment of residents. On September 11, 2012, DSHS Complaint Investigator Melissa Axtell, a registered nurse, entered Sarah's Care adult family home without advance notice. Axtell interviewed three of the complainants, the Everts, and other Sarah's Care staff.

On September 26, 2012, DSHS notified Stephen and Sarah Evert that the State was summarily suspending and revoking Sarah's Care's adult family home license. The

8

notice also prohibited the home from accepting additional residents. DSHS immediately revoked the license on the ground that serious deficiencies in the home constituted an immediate danger to the health, safety, and welfare of residents. The failings included failure to confirm tuberculosis testing of a caregiver, failure to reasonably accommodate Greg before issuing a discharge notice, failure to safeguard Debbie's safe and orderly discharge, and failure to prevent abuse of residents. On September 26, DSHS also served the Everts with a statement of deficiencies and plan of correction. The notice accused Sarah Evert of abuse and neglect of adult family home residents. On October 5, 2012, Sarah requested an administrative hearing to challenge the license revocation.

On November 20, 2012, while Stephen and Sarah Evert awaited an administrative hearing, Stephen launched a public website, www.sarahscare.com, on which he posted long rants against DSHS. The website publicized identifying information of former residents of Sarah's Care, including residents' first and last names. Postings also accused Debbie and Greg of welfare fraud and abusing Sarah's Care staff. One post described niceties of residents' care requirements. On the Internet site, Stephen Evert plastered one resident's private communications with his attorney and guardian and another resident's photograph.

On December 7, 2012, DSHS employee Ken Yancy discovered Sarah's Care website and alerted Elena Madrid, DSHS field manager. Madrid and Melissa Axtell studied the website and ascertained that revelations on the site violated statutes and

regulations protecting adult family home resident privacy and confidentiality. Madrid contacted Stephen Evert and demanded immediate removal of the confidential information from the website. Madrid warned Stephen that DSHS would assess $3,000 per day fines for each day that the information remained online.

On December 7, DSHS also issued Stephen and Sarah Evert a notice of civil fine. The notice informed the Everts that DSHS would not reinstate the adult family home license if they failed to immediately remove from the online website all confidential resident record information. At the administrative hearing, Madrid testified that the Everts deleted all confidential information by December 13, 2012.

PROCEDURE

Stephen and Sarah Evert also demanded an administrative hearing to challenge the civil fines. DSHS consolidated the appeal challenging the fines with the appeal disputing the license revocation. The appeals' administrative law judge affirmed DSHS' revocation of Sarah's Care's adult family home license, the findings of abuse, and the $3,000 daily fine. The administrative law judge's order did not identify the window of time to which the fines applied.

Stephen and Sarah Evert appealed the administrative law judge's decision to the DSHS Board of Appeals (Board). The appeal challenged numerous findings of fact and the imposition of the fine but withdrew opposition to the revocation of the adult family home license. The Board nonetheless affirmed DSHS' decision to revoke the adult

family home license and upheld the finding of abuse against Sarah. The Board calculated the Everts' fine from November 20, 2012, the day Stephen Evert created the website, to April 16, 2012, a total of 147 days. Evert testified that he suspended the website on the latter day. The Board's ruling did not address whether confidential information remained on the website until cessation of the site.

Stephen and Sarah Evert sought judicial review in superior court of the DSHS Board's decision. In court, the Everts challenged the sufficiency of the evidence supporting the findings of abuse and neglect against Sarah Evert. The Everts also argued that instructions to remove the residents' confidential information from the website and the civil fine violated their constitutional right to free speech.

The superior court modified two of the Board's rulings. The court acknowledged DSHS' concession that the Board's finding of fact 43 incorrectly found that DSHS demanded that Stephen Evert dismantle the website, when the department instead ordered expungement of confidential content. The superior court also found insufficient evidence to support the Board's imposition of the $3,000 daily fine for 147 days. The superior court reduced the fines to a period of seven days, the window of time between when DSHS discovered the violation and Stephen Evert removed the offending information.

## LAW AND ANALYSIS

Stephen and Sarah Evert raise three issues on appeal. They contend that substantial evidence does not support the finding of abuse and neglect against Sarah

11

Evert. They argue that DSHS violated their right to free speech by demanding elimination of former residents' identifying information from Sarah's Care's website. They maintain that the $21,000 fine imposed by DSHS on the Everts for posting the information on the website constitutes an excessive fine in violation of the Eighth Amendment to the United States Constitution and article I, section 14 of Washington's Constitution.

*Issue 1: Whether substantial evidence supports DSHS' finding of abuse and neglect against Sarah Evert?*

*Answer 1: We decline to address this assignment of error because the Everts do not properly assign error to any findings of fact, fail to cite evidence in the record to sustain their assignment of error, and fail to analyze the findings.*

Stephen and Sarah Evert's brief specifies their assignment of error 1 as:

> The administrative Initial Decision, dated June 18, 2013 affirmed in the Review Decision and Final Order dated December 20, 2013 erred in finding Sarah Evert and Stephen Evert abused vulnerable adults placed in their Adult Family Home as that finding is not supported by substantial evidence in the record when the record is considered as a whole.

Br. of Appellants at 1 (footnotes omitted). The assignments of error identify no specific or numbered finding of fact entered by either the administrative law judge or the Board. In an appendix, the Everts isolate specific findings they challenge, but they primarily reference the initial order entered by the administrative law judge. The appendix only assigns error to seven of the Board's findings of fact.

12

Those findings only address the Everts' assertion of free speech rights. The appendix contains no citation to the record for the alleged Board's errors. In the body of the brief, the Everts engage in a scattergun analysis without identifying any finding of fact.

Stephen and Sarah Evert's assignments of error and brief disturb several principles of appellate review. Under the Administrative Procedure Act, ch. 34.05 RCW, the relevant findings on appeal are those of the Board, not those of the administrative law judge. *Tapper v. Emp't Sec. Dep't*, 122 Wn.2d 397, 406, 858 P.2d 494 (1993). This rule follows from the agency holding authority to substitute its findings for those of an administrative law judge. RCW 34.05.464(4); *City of Fed. Way v. Pub. Emp't Relations Comm'n*, 93 Wn. App. 509, 511-12, 970 P.2d 752 (1998).

The rules of appeal contain special rules concerning assignments of error. RAP 10.3(g) and (h) read:

> **(g) Special Provision for Assignments of Error.** . . . A separate assignment of error for each finding of fact a party contends was improperly made must be included with reference to the finding by number. The appellate court will only review a claimed error which is included in an assignment of error or clearly disclosed in the associated issue pertaining thereto.
> **(h) Assignments of Error on Review of Certain Administrative Orders.** In addition to the assignments of error required by rule . . . 10.3(g), the brief of an appellant or respondent who is challenging an administrative adjudicative order under RCW 34.05 shall set forth a separate concise statement of each error which a party contends was made by the agency issuing the order, together with the issues pertaining to each assignment of error.

RAP 10.3(a)(6) directs each party to supply, in his or her brief, "argument in support of the issues presented for review, together with citations to legal authority and references to relevant parts of the record." We do not consider conclusory arguments that are unsupported by citation to authority. *Joy v. Dep't of Labor & Indus.*, 170 Wn. App. 614, 629, 285 P.3d 187 (2012), *review denied*, 176 Wn.2d 1021, 297 P.3d 708 (2013). Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration. *West v. Thurston County*, 168 Wn. App. 162, 187, 275 P.3d 1200 (2012); *Holland v. City of Tacoma*, 90 Wn. App. 533, 538, 954 P.2d 290 (1998).

Stephen and Sarah Evert fail to properly assign error to any relevant findings of fact concerning the conclusion of abuse of residents. Because of a disjointed analysis of the assignments, this court must guess as to what findings are challenged, where to locate the findings in the record, and what evidence supports and disputes the findings. Therefore, we reject the Everts' challenge to the Board's findings of fact.

*Issue 2: Whether DSHS violated the Everts' right to free speech by requesting they remove the personal and confidential health information of former residents from www.sarahscare.com?*

*Answer 2: No.*

Stephen and Sarah Evert next contend that DSHS violated their right to free speech under the First Amendment of the federal constitution or under article I, section 5

of our state's constitution. The Everts do not assert this right under any particular theory of First Amendment law, nor do they challenge the constitutionality of the applicable statute and regulations. Instead, they argue that Stephen's posting of former residents' confidential identifying and medical information was permissible because Stephen "scrubbed" the website of residents' names and neither Debbie nor Greg have independently sought legal recourse against them for slander. DSHS contends that the Everts have no cognizable First Amendment or Washington Constitution claim and their argument lacks sufficient clarity to address. We agree with the State.

Stephen Evert's posting of personal identifying information and medication regimes of patients violated a Washington statute and state regulations. RCW 70.129.050 provides:

> The resident has the right to personal privacy and confidentiality of his or her personal and clinical records . . .
>
> . . . .
> (2) The resident may approve or refuse the release of personal and clinical records to an individual outside the facility unless otherwise provided by law.

WAC 388-76-10575(1) reads:

> The adult family home must ensure the right of each resident to personal privacy that includes . . . (b) Medical treatment; (c) Clinical or resident records.

WAC 388-76-10315 provides:

> The adult family home must:

15

(1) Create, maintain, and keep records for residents in the home where the resident lives and ensure that the records:

(a) Contain enough information so home can provide the needed care and services to each resident;

(b) Be in a format useful to the home;

(c) Be kept confidential so that only authorized persons see their contents;

(d) Are only released to the following persons:

(i) A health care institution;

(ii) When requested by the law;

(iii) To department representatives; and

(iv) To the resident.

Stephen Evert disregarded the commands of Washington law by publishing intimate details of residents' care in a disparaging mode. Stephen displayed the confidential information entrusted to Sarah's Care while using residents' first and last names on a website accessible to anyone online and distributed widely. Nevertheless, the Everts attempt to use the First Amendment to shield them from the consequences of their actions. As explained below, the attempt fails.

This court does not address constitutional arguments when not adequately briefed or supported with citation to apposite legal authority. *Tunstall v. Bergeson*, 141 Wn.2d 201, 224, 5 P.3d 691 (2000); *Farnam v. CRISTA Ministries*, 116 Wn.2d 659, 680, 807 P.2d 830 (1991); *City of Spokane v. Taxpayers of City of Spokane*, 111 Wn.2d 91, 96, 758 P.2d 480 (1988). A party cannot rely on conclusory statements regarding alleged constitutional infirmities. *Lund v. Dep't of Ecology*, 93 Wn. App. 329, 339, 969 P.2d 1072 (1998). Washington courts, invoking naughty and nautical flair, have declared

through the years: "'[N]aked castings into the constitutional seas are not sufficient to command judicial consideration and discussion.'" *Pub. Hosp. Dist. No. 1 v. Univ. of Wash.*, 182 Wn. App. 34, 49, 327 P.3d 1281 (2014), *review denied sub nom. Pub. Hosp. Dist. No. 1 v. Univ. of Wash.*, 337 P.3d 326 (Wash. 2014) (quoting *State v. Johnson*, 179 Wn.2d 534, 558, 315 P.3d 1090, *cert. denied*, 135 S. Ct. 139, 190 L. Ed. 2d 105 (2014)); *In re Rosier*, 105 Wn.2d 606, 616, 717 P.2d 1353 (1986) (quoting *United States v. Phillips*, 433 F.2d 1364, 1366 (8th Cir. 1970)).

As authority for their free speech claim, Stephen and Sarah Evert cite three misplaced cases: *Demers v. Austin*, 746 F.3d 402 (9th Cir. 2014); *Hopper v. City of Pasco*, 241 F.3d 1067 (9th Cir. 2001); and *Bradburn v. North Central Regional Library District*, 168 Wn.2d 789, 231 P.3d 166 (2010). *Demers v. Austin* addressed the scope of First Amendment protections afforded in the academic public employment context. A tenured Washington State University professor distributed a pamphlet on school grounds, which distribution he contended resulted in retaliatory unfavorable performance reviews and audits by his department. In reversing a summary judgment dismissal of the case by the district court, the Ninth Circuit held that *Pickering v. Board of Education*, 391 U.S. 563, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968) controlled because teaching and academic writing are a special concern of the First Amendment in the public employment context. The pamphlet distributed by Demers addressed matters of public concern because it was

17

widely distributed and made broad proposals to change the direction and focus of the Edward R. Murrow School of Communication.

Stephen and Sarah Evert provide a perplexing assay of *Demers*. The Everts actually cite to *Demers v. Austin*, 729 F.3d 1011 (9th Cir. 2013), a version of the opinion later withdrawn. Therefore, all of their citations to *Demers* are incorrect. Moreover, the Everts focus on the method of distributing writings, only one aspect of *Pickering*'s "public concern" analysis, rather than the substance of the speech deserving of First Amendment protections.

Stephen and Sarah Evert cite no authority that holds an operator of a privately owned adult family home is afforded the same First Amendment protections as a public employee because the operator accepts resident placements from the State. They forward no legal authority that the owner of an adult family home deserves the same protection as a public employee.

The high traffic to Stephen Evert's spiteful website might render the site's content of public concern. Nevertheless, the substance and distribution of allegedly protected information is only the first part of a *Pickering* analysis. A public employee seeking shelter under the First Amendment must also demonstrate that his interest in commenting on matters of public concern outweighs the interest of the State, as an employer, in promoting the efficiency of the public service it performs. *Pickering*, 391 U.S. at 568.

18

The Everts advance no argument that their vindictive actions outweigh the State's interest in protecting the privacy and safety of its vulnerable adults.

*Bradburn v. North Central Regional Library District*, 168 Wn.2d 789, 231 P.3d 166 (2010) and *Hopper v. City of Pasco*, 241 F.3d 1067 (9th Cir. 2001) are public forum cases. *Bradburn* addressed a certified question from the Eastern District of Washington regarding whether the North Central Regional Library (NCLR) could permissibly restrict patron access to websites under article I, section 5 of the Washington Constitution. In holding that NCLR could lawfully filter patrons' Internet access, the court determined (1) Internet access in a public library is not subject to public forum analysis or strict scrutiny review, and (2) a public library's filtering policy does not violate article I, section 5 if it is "reasonable when measured in light of the library's mission and policies, and is viewpoint neutral." *Bradburn*, 168 Wn.2d at 815.

*Hopper* involved an appeal from two artists who were invited to display their art in the Pasco City Hall Gallery, but whose works were subsequently rejected because city officials found them too controversial. *Hopper*, 241 F.3d at 1073. Reversing the district court's grant of summary judgment to the city on the artists' First Amendment claims, the Ninth Circuit found that the city had created a designated public forum. *Hopper*, 241 F.3d at 1081. As such, Pasco's reason for excluding the artists' work failed under the applicable strict scrutiny analysis, as the city could not identify a compelling government interest in censoring the artwork. *Hopper*, 241 F.3d at 1081-82.

19

Stephen and Sarah Evert's argument presupposes that Stephen created a public forum by building the website www.sarahscare.com and not restricting access to it. This argument is nonsensical. Stephen Evert is not a government entity. A party must make a threshold showing of government ownership and control before courts will engage in a "forum analysis" to determine what, if any, free speech protections apply. *Bradburn*, 168 Wn.2d at 813.

Stephen and Sarah Evert present only a haphazard, incomplete First Amendment argument, and for practical purposes, this court cannot address the Everts' contention. The Everts also fail to advance authority suggesting that the Washington Constitution provides any enhanced free speech protection in the setting on appeal.

*Issue 3: Whether the $3,000 per day fine imposed by DSHS on the Everts is an excessive fine in violation of the Eighth Amendment?*

*Answer 3: We refuse to address this issue because Stephen and Sarah Evert did not raise this issue before DSHS or the superior court and the Everts fail to show manifest constitutional error.*

Stephen and Sarah Evert raise their third assignment of error for the first time before this appellate court. They argue that the fine imposed by DSHS is unconstitutional as excessive. The Everts did not contend until their reply brief that DSHS misapplied Washington rules when levying the fine, assuming this argument is even raised in the second brief. We do not address claims first asserted in a reply brief.

20

*Puget Sound Marina, Inc. v. Jorgensen*, 3 Wn. App. 476, 480, 475 P.2d 919 (1970). The

Everts do not challenge the constitutionality of the statutory scheme enacted by the

Washington legislature or the regulatory scheme of fines adopted by DSHS. Therefore,

we limit our review to the constitutional claim of excessiveness based on the Everts'

individual circumstances.

We must address whether Stephen and Sarah Evert may advance their

constitutional argument for the first time before this appellate court. RAP 2.5(a)

provides, in relevant part:

> The appellate court may refuse to review any claim of error which
> was not raised in the trial court. However, a party may raise the following
> claimed errors for the first time in the appellate court: . . . (3) manifest error
> affecting a constitutional right.

In seeking review under RAP 2.5(a)(3), an appellant must identify a constitutional error

and show how the alleged error actually affected the defendant's rights at trial. *State v.*

*Kirkman*, 159 Wn.2d 918, 926-27, 155 P.3d 125 (2007). It is this showing of actual

prejudice that makes the error manifest, allowing appellate review. *State v. McFarland*,

127 Wn.2d 322, 333, 899 P.2d 1251 (1995). The focus of the actual prejudice must be on

whether the error is so obvious on the record that the error warrants appellate review.

*State v. O'Hara*, 167 Wn.2d 91, 99-100, 217 P.3d 756 (2009). We hold that the record

does not permit review of whether the DSHS fine was excessive and thus the Everts do

not raise an error of manifest constitutional proportions. Thus, we refuse to directly

21

address the merits of the Everts' constitutional assertion.

The Eighth Amendment commands: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." Article I, section 14 of the Washington Constitution is identical. The Excessive Fines Clause limits the government's power to extract payments, whether in cash or in kind, as punishment for some offense. *United States v. Bajakajian*, 524 U.S. 321, 328, 118 S. Ct. 2028, 141 L. Ed. 2d 314 (1998). A fine is excessive if it is "grossly disproportional to the gravity of a defendant's offense." *Bajakajian*, 524 U.S. at 334. Disproportionality is not sufficient to prove a constitutional defect. "Gross" disproportionality is required.

The Evergreen Supreme Court has held that an Excessive Fines Clause claim "involves a genuine constitutional issue." *State v. WWJ Corp.*, 138 Wn.2d 595, 603, 980 P.2d 1257 (1999). Nevertheless, the record must be sufficiently developed in order for a reviewing court to evaluate the merits of such a claim under RAP 2.5(a)(3). *WWJ*, 138 Wn.2d at 603-04.

*State v. WWJ Corp.* controls this appeal. In *WWJ*, our high court asked whether the record was sufficiently developed to determine whether a $500,000 fine assessed against WWJ for multiple violations of the Mortgage Broker Practices Act, ch. 19.146 RCW, and the Consumer Protection Act, ch. 19.86 RCW, offended the Excessive Fines Clause. In holding the record insufficient to allow review of the newly-raised Eighth Amendment claim, the Supreme Court identified the "grossly disproportional" standard

22

articulated in *Bajakajian*. The court found the record wanting because it lacked an analysis of the gravity of each of WWJ's multiple violations. The high court noted that had WWJ objected to the size of the requested fine at the trial level, the State and the court would have had the opportunity to address the issue. The court held any claimed error was not manifest and therefore review was not warranted under RAP 2.5(a)(3).

Stephen and Sarah Evert contend, for the first time on appeal, that DSHS' $3,000.00 per day fine for posting adult family home residents' medical and personal identifying information online is excessive, regardless of the number of days for which it is imposed. They urge this court to review the issue and contend that DSHS failed to demonstrate the proportionality of the fine in relation to the harm caused by their posting of the information. DSHS notes that the Everts have not challenged the agency's findings that the Everts' actions harmed their former residents.

The Washington legislature authorized DSHS to impose civil penalties of up to $3,000 per day for each incident wherein an adult family home provider breaches a statute or associated rules. RCW 70.128.160(1)(a), (2)(d). WAC 388-76-10976 provides a tiered grid to guide DSHS in imposing fines. The grid specifies that DSHS may impose the $3,000 per day fine when the offending action constitutes serious harm and remains uncorrected or when the violation constitutes an imminent danger or immediate threat to the residents in its care. WAC 388-76-10976.

In an appendix to their opening brief, Stephen and Sarah Evert assign error to

several of the DSHS Board's findings regarding the propriety of the fine imposed. Nevertheless, the errors claimed by the Everts merely reargue the facts and the Board's credibility findings. The crux of their argument is that sharing personal and embarrassing medical information of vulnerable adults causes no harm as long as the posting changes the adult's first names.

Stephen and Sarah Evert do not discuss reasons why the $3,000 per day fine is excessive. In their briefing, they identify no daily amount that would be apposite. Moreover, the Everts confusingly argue that they face a fine of "over a half million dollars," even though the superior court reduced the fine to $21,000. Br. of Appellants at 27. In oral argument, the Everts first contended that a fine in any amount would be excessive, but such an argument goes to the validity of the fine not the disproportionality of the fine. Later in oral argument, the Everts asserted that any amount above $1,000 was excessive. The Everts still did not analyze for this court why an amount above $1,000 is grossly disproportionate. The appellate record and the Everts' arguments fail to assist this court in determining whether the fine is "grossly disproportionate."

## CONCLUSIONS

We affirm the DSHS' finding of abuse by Sarah Evert. We affirm the superior court's reduction of the fine to $21,000.

24

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

Fearing, J.

WE CONCUR:

Brown, A.C.J.

Korsmo, J.